Alexander Shapovalov v. Morgan Stanley et al. Mr. Hall? Yes, thank you, Your Honor. Whenever you're ready. Thank you, David Hall, on behalf of Plaintiffs' Repellents. May it please the Court. These consolidated or uncoordinated actions arise out of a massive market manipulation scheme that collapsed. The defendants in this case enabled and built up that scheme. And in March 2021, as they learned of it teetering toward collapse, they front-ran the collapse, offloading billions of their own proprietary shares and tipping their own third-party hedge fund-preferred clients to the same. The scale of the scheme and the collapse is perhaps unprecedented. It's staggering, a $100 billion market loss, but the facts do cleanly fit well-established theories of liability under 10B of the Exchange Act of 1934. We've alleged two principal theories under that claim. There's the tipper-tippee theory, which turns on a breach of a duty owed to the issuers or shareholders. And then we also allege a misappropriation theory that, in contrast, turns on a breach of a duty that the banks, the defendants here, owe directly to the collapsing hedge fund, Archegos. Below, we had an initial decision from Judge Crotty that, while it dismissed our case, found that we had adequately fled almost all of the elements of our tipper-tippee theory. The only element that was missing, per Judge Crotty, was insufficient allegations of a personal benefit. We amended. We pled that in spades. And just before a ruling, the case was transferred to a different judge, Judge Rakoff, who, shortly after receiving the case, issued an opinion that contradicted Judge Crotty's holdings on several elements and then dismissed our case in its entirety. We've appealed from Judge Rakoff's decision, and we think it rests on several rather straightforward errors of law and errors of fact. With regard to the tipper-tippee theory, the really threshold error that permeates all the course of discussion is a misdefinition of what qualifies as material nonpublic information. I know that that's a large part of your focus in the briefing, but I'd like to, I guess, maybe pull you away from that just to address the question of what is it the duty that is owed here? Assuming that we were to agree that there's MMPI involved here, what's the duty that Archegos, I guess, owed to the issuers, and what's the source of that duty? Sure, Your Honor. There are two bases for our tipper-tippee theory, which turns on Archegos or Archegos, I've heard both, their duty to the issuers. First, as a controlling shareholder, that's a traditional insider. That's one of the most well-established bases for insider trading liability and duties to issuers and shareholders. Archegos, through the scheme that was built up and enabled by defendants, took on upwards of 70% of the float of these small to mid-cap stocks. Are they truly a controlling shareholder in the traditional sense? I mean, they're not. I assume you're counting both their shares and the defendants' hedged shares, and so do they really have the kind of control that we would think of when we talk about a controlling shareholder? Yes, Your Honor. So first, a beneficial ownership can establish control. You don't need a record ownership. So the fact that they bought or they took this control via total return swaps doesn't change it. I'm sorry. Has that been held that a beneficial owner can be a controlling shareholder? Has that been found in the context of insider trading, or is that in other contexts where that's considered? It's been held repeatedly by this Court. We cite the Levi v. Southbrook case, I think it's 1987, that finds insider trader liability and duty based on beneficial ownership, not record ownership, not legal title to the underlying shares. It happens a lot in the – I believe this Court recently ruled in a short-swing profit case, in the Tannenbaum case, where you have a shareholder who owns a beneficial interest through some other entity like a trust. So often the plaintiff only has beneficial ownership but still qualifies as a controlling insider because of that beneficial ownership, even though they don't hold title to the underlying shares. So all controlling shareholders, setting aside the question of beneficial interest or not, although I want to return to Judge Lee's question about does this include the hedge stock shares, but all controlling shareholders have the same kind of fiduciary duties, in your view of the law, whether or not they have the kind of access we normally associate with them, right? So the reason – one of the reasons controlling shareholders have a duty as far as – of information is that they are privy to it, right? I don't know that that's alleged here, that Archegos had – was privy to information about the issuers, other than it was privy to its own financial situation and the fact that it was in big trouble. But I don't think there's an allegation that Archegos had inside information about, you know, the kinds of things we often think about. Oh, this company is about to release a new product, or the company's product didn't get approval from whatever agency. So is it your position that all controlling shareholders, no matter what actual access they have, have that duty? Yes, Your Honor. So our position is that controlling shareholders are insiders, traditional insiders, without any plus showing of access or control. By being a – just as a CEO or an officer or director is an insider without any additional showing. But definitely those folks have access to the day-to-day operations of the company. So I don't think that's a helpful comparison, that a controlling shareholder, even if they have no direct contact with the issuer, is definitionally in every case. Yes, that is our position. In addition, Your Honor, and regardless, once the first threshold issue of what qualifies as material nonpublic information is corrected, and it's not limited to inside corporate information, as I think your hypothetical supposes, and includes outside information of controlling shareholders that are about to tank the market for the securities, we have pled access. We have pled the controlling shareholder plus because we have alleged in great detail that Archegos had access to material nonpublic information and then tipped it. So even if we apply what we think is sort of an incorrect controlling shareholder plus access standard, we've alleged it. And to go back to Judge Lee's additional question, when you say controlling, are you counting the hedge shares with the TRS shares or not? So we're alleging a combination. So it's the underlying hedge shares under the CSX, I believe, decisions, which were affirmed in relevant part by the Second Circuit that we cite. The underlying, the holder of the TRS is treated as the beneficial owner of the underlying shares. And so it's really a one-to-one ratio here. So whether it's beneficial ownership. So the answer is yes. You're counting the hedge shares towards the total percentage of ownership that makes them controlling. Yes, though we're not double counting, Your Honor. No, no, I know you're not double. It's two different sets of shares. Yes, but they correlate one to one. The shares that are actually in the swap and the shares that the banks take as hedge, right? Yes. In the CSX cases I just referenced, this Court recognized that the holder of the swap is treated as the beneficial owner of the underlying hedge shares. But they are controlling shareholders under your theory because we are combining those numbers. And that's allowed, you're saying, under CSX. Yes, Your Honor. They're controlling shareholders also, Your Honor, because they held collateral that was above the thresholds of Section 13. And so the way we've pledged this aspect of it is even if they're not insiders, even if somehow we lose on whether Arquegos is an insider, there's still a theory in the case that neither the District Court below nor my friends on the other side have addressed on appeal, that Arquegos breached duties owed to the shareholders by breaching Section 13 and not disclosing their over 10 percent beneficial holdings of these stocks. That was held in the Gruber decision by actually Judge Rakoff to be a breach of 10b-5. That is a breach of a duty that's owed to the shareholders under Section 13. Shareholders who take an ownership interest, whether beneficial or legal title, above that threshold owe a duty to the shareholders to disclose it. The shareholders have a right. In counting that, I think this goes back to Judge Merriam's question, in the premise there is that they are controlling and owe that duty because you're counting not only the shares that were purchased by the defendants in the swap deal with them, but also the shares that the defendants independently purchased outside of Arquegos. Correct? So the hedge shares are the proprietary shares that the banks buy to hedge their exposure to the total return swap. Whatever you call them, hedge shares, hedge shares because they're hedging their bets so they don't lose if Arquegos makes a bad decision. Those shares you're counting to reach to this threshold question of whether they have the control. They're a controlling shareholder. However you define it, controlling plus, controlling because they have access, you know, to documents. That is what creates the duty. You're counting both sets of shares, correct? Yes. And I just want to clarify, Your Honor, that when I say both sets, I mean the collateral. So those are shares that are actually owned by legal title by Arquegos that are posted to the defendants to justify their margin loans to buy all this exposure. Plus the beneficial ownership interest they had via the total return swap and the corresponding hedge shares that are owned by defendants. So combined, yes, about 5% of this 70% of the float is collateral. The rest corresponds to the hedge shares that they are beneficial owners of. Who's they? Arquegos. So Arquegos is record holder. What about the shares that the defendants bought, purchased, and owned on their own? Those shares. You're not counting those or you are? We are counting those. Okay. They correspond directly. That's a simple question. You're counting those for control purposes. Yes, Your Honor. And if we disagreed with you that those should be counted for control purposes, would you then concede that Arquegos doesn't have a controlling, is not a controlling shareholder? So for the status as a controlling shareholder, you know, of the whole company as a traditional insider, yes, but for the Section 13 duty that's a lower threshold that isn't, you know, you don't need upwards of 70% to establish. We're really talking about 5% and 10% under Section 13. Even Arquegos' proprietary collateral meets that threshold. But the 5%, don't you have to also be an officer, director? No, you can be a beneficial owner. You can be an outsider entirely. So I realize I'm out of time, Your Honor. Yeah. You'll have some rebuttal, and so we'll hear from your adversary now. Okay. Thank you very much. Good morning, Your Honors. Charles Duggan, Davis Polk, and Wardwell for defendants at police. As an initial point, Your Honors, there's no allegation of knowledge or participation in Arquegos' scheme by the defendants in this case. The complaint itself makes clear the defendants were misled by Arquegos. They were deceived by the activities that it was engaged in. They had no understanding until the very last days of the drama that Arquegos had amassed the massive concentrated positions that it had. So a critical important point, I think, to bear in mind. There are two very, very significant novelties in Mr. Hall's argument regarding Arquegos' status as an insider of the various entities that had issued the stock. The first is the one that was being discussed, which is are the total return swap arrangements that it had entered into with the defendants sufficient to confer upon it insider status as that term is used for purposes of the insider trading laws? And the answer to that is no court has ever said so. It's a completely novel notion. Mr. Hall repeatedly referred to Arquegos' economic exposure under those total return swaps as somehow constituting beneficial ownership of the shares. That is not the case. Arquegos did not own them. It had no capacity to vote them. It merely had entered into a contractual relationship that exposed it to movements in the price of those shares. Just as the defendants, as the counterparties to the total return swaps, as owners of the shares themselves were the proprietary holders of them and subject to exposure based on those same movements. The second novelty is the notion that an insider can somehow engage in insider trading without making use of information that the insider possesses in confidence that is actually property of the issuer. And the Chessman case would be one example where this concept has been elucidated by this Court. An insider breaches a duty by misusing information the insider possesses by virtue of its position as an insider. And some of the questioning that the benches raised went to this point. Here not only was there no access on the part of Arquegos to any internal information within these issuers, in fact the whole design of its investment strategy had been to mask its participation in the exposure to those stocks. But it possessed no information that was internal to them. What Arquegos possessed was information that was internal to Arquegos. It understood its positions. It knew the amount of risk that it had taken on. And all of the information that is relevant to this case is information that was internal to Arquegos. Counsel, can you address the issue that your opponent raised about the apparent inconsistency between Judge Crotty's decision on the first motion to dismiss and Judge Rakoff's decision on the second motion to dismiss? Your Honor, the only point of difference there is Judge Crotty was prepared to entertain on the pleadings the notion that the financial aspect of Arquegos' exposure got them over the hump for purposes of this sort of status as an insider. Judge Rakoff rejected that. And obviously we believe Judge Rakoff had a better interpretation of how the law works in this area. But the point is almost a moot point because while insider status is necessary for the relationship of trust and confidence to exist, the relationship in and of itself is not sufficient. There has to be a use of proprietary information by the insider in breach of a duty to the issuer in order for it to constitute the basis for insider trading. And there's none of that here. There's none of that on the part of Arquegos. And certainly there's no knowledge on the part of the defendants, right, that Arquegos even had these positions or was in a position to abuse any trust that it might have by virtue of insider status if it had that. It's essential for TIPI liability to attach that the TIPI knows that the information in its possession is something that was conveyed to it in breach of a duty. And nothing about the facts as alleged in this complaint create any suggestion that there was such a duty, that there was such information, and certainly that the defendants had any understanding that there was a breach of that duty in their own actions in the case. Duty is equally important to the other piece of this, which is the whole misappropriation allegation, that by virtue of the prime brokerage relationship and the total return swap contracts that the defendants had with Arquegos, that there was some duty that ran from the defendants to Arquegos not to make use of information that the defendants learned in the course of their dealings with Arquegos. But law doesn't support that concept. This is an arm's-length transaction. And the defendants, as counterparty to these swap transactions, and to the extent that they acted as prime brokers, were in a purely arm's-length footing with respect to Arquegos. And, indeed, were supplied information by Arquegos about its exposures and about its capacity to make good on its debts to them, precisely because they had a right to that information, because they were counterparties. So I understand your argument that they had a right. You could understand how it might be troubling to the average investor who isn't aware of these arrangements on the books. Your client is the owner of these shares. Arquegos negotiates to benefit if the shares go up and pay the margin if the shares go down. And yet your clients or the defendants here hedge against that by buying their own shares, which they can sell quicker than the market can respond. So you can understand how that might be troubling to the average investor who isn't aware of all this sort of transpiring behind the scenes. Your Honor, what I would say by way of response is that, first of all, total return swaps are a feature of the trading marketplace. They are well understood. The allegation in the complaint is also that the defendants in this case made their proper securities law filings that were required by the positions that they had taken on on their side of these total return swap arrangements, where they were, in fact, the buyers and the owners of these securities. But the law is very well settled that possession of information is not in itself a restriction on the use of that information. There has to be a duty. And insider trading only occurs where there has been a breach of that duty. And there's nothing in the complaint that would support the notion that either Arquegos breached a duty to the issuers or that the defendants here breached a duty to Arquegos simply by applying the terms of the agreements to which they were a party, which was to impose margin requirements, make margin calls, and eventually, when Arquegos could not supply the funds necessary to satisfy the margin call, to issue notices of default and to take the measures that they thought appropriate to protect themselves from the exposures that they had in the market. It's a feature of market trading. Not everyone can assume. Or a bug.  It's a feature. I mean, it does feel, and I think Judge Rakoff said, this is a devious scheme, right? And it feels a little iffy. But just because you have the gut feeling that it's a little iffy, it sounds like what you're saying is that this is the thing that is allowed under the SEC's laws and regulations. Your Honor, the scheme here was the scheme by Arquegos to amass positions. Which required – Arquegos couldn't have done that effectively, right, without the sort of veil of the TRS structures. Well, they also couldn't have done it if they had been forthright with their counterparties about the nature of the exposures that they had been taking on. A central component of the scheme was the deception of their counterparties in these transactions. Right. And I'm not asking you – we're not in front of Congress talking about amendments to the SEC laws. But I think that is something that sort of comes out of the papers here is there's a discomfort. Some of the appellant's arguments seem to say, look, this whole system is not okay. And I understand that argument. And as Judge Kahn says, you can imagine an investor being uncomfortable. But I guess, as you say, you're calling it a feature. It is accepted and widely known to be occurring and not illegal to engage in these TRS structures. That is correct. And when there are abuses such as Arquegos engaged in, there are consequences, which is why there was a criminal trial. All right. Thank you. We have your argument. Thank you. I guess I'll ask you to address that. It does feel, you know, this is an uncomfortable structure sometimes when you look at it. And Judge Rakoff felt strongly about sort of its upshot. But I guess the question is, if this is a system that the SEC has decided – is aware of and has decided to allow, how do we consider that in deciding whether Arquegos in particular, whether these defendants in particular in this Arquegos transaction should be held liable? Thank you, Your Honors. I think you can look to the other counterparties. The defendants are the only defendants here because they're the only ones that breached the SEC rules, that violated 10B and ran the collapse. There were other TRS counterparties that didn't, that complied with all their requirements and their duties, and they lost their shirt. Several CEOs lost their jobs. Credit Suisse was merged. So you can look to the other counterparties to Arquegos to see what the SEC expected and allows and what the rules and guidelines – it's a stark contrast. There's only two defendants in this case because there's only two counterparties that breached all of those rules and front-ran the collapse. So it's not the TRS system that's a problem here? No, TRS are very common. But front-running the collapse of a hedge fund or a market manipulation scheme that you built, that's what's uncommon here. And that it hasn't been addressed by a Second Circuit opinion yet isn't an indictment of the TRS system as a whole, but it's, I think, a feature of the flexibility of these types of catch-all insider trading regulations. But there was an underlying criminal case, right, or an underlying case brought by the SEC, but it was against Arquegos and identified the defendants or the counterparties as victims, if you will. Yes. So what are we to make of that? Well, I can't argue the policy of why the enforcement agencies tend to go after what we consider in the private bar as the low-hanging fruit. The credit crisis happened, not a single white-collar defendant went to jail. There are all those issues. But I also think it's common to issues you see in RICO cases where, you know, a defendant can be a victim of the sort of head of the RICO, they're getting extorted, and then also passing it down. And so you can have someone like the banks here that, you know, maybe isn't a victim in some sense from Arquegos, but is also committing fraud itself. So I don't think it's inconsistent to be both a victim in some sense for the, you know, whether they were lied to, to some extent, by Arquegos. But then they also breached their duties under clear guidance under 10B. I would like to briefly address a few points raised. One, the information is not limited to internal information. And if we went on that, I think it really refutes a lot of the court and my opponent's reasoning. As whether they qualify as controlling shareholders, I'll just point out that Judge Rakoff accepted that they did, that we had alleged that they were controlling shareholders. So on this appeal, we think that that's not before the court. That's at special appendix 35. He then went on and said controlling shareholders is not enough. You have to show this plus factor of access to internal info. We think we, you know, internal info isn't the limit, and we've alleged access. As far as the knowledge requirement that my colleague referenced, I'd point the court to the Obis decision, which makes clear that as far as the bank's knowledge of whether Arquegos was in breach, that's not a knowledge requirement. That's a negligence standard. That's a very low standard, and we've pled more than enough. I would point the court to the appendix at 256 through 58, and the complaint paragraph cites, we allege in great detail, that they did have access to many facts and red flags that would satisfy a negligence standard. And then briefly on the misappropriation theory, it really doesn't depend on Arquegos being an insider at all. We've alleged in great detail that there was a duty of confidence from their express agreements, which aren't before the court, even though Judge Rakoff assumed a lot about what those agreements might or might not say. We don't have the agreements, but we've alleged that those agreements, while they may have allowed the banks to sell some of the collateral, they did not allow the banks to sell their head shares. Even assuming Judge Rakoff's read and defendants say so about what those contracts say and that they gave the banks the right to sell upon a notice of default, there's a fundamental error of fact in Judge Rakoff's reasoning. He gets the dates wrong. He said — It's a notice of default, not an event of default? An event of default requires notice. So for here, they're one and the same. So not the triggering event is insufficient. It's the notice that has to trigger it. Yeah. The bank has to give notice to Arquegos that they are in default. It's not enough for Arquegos to say, hey, we're running low on cash, the default might be coming. And so the notice of default, and this is undisputed, happens on March 26, 2021. We allege in great detail sales and meetings with defendants that disclose material nonpublic information on March 24th and 25th. So that's two days before the notice. So even if the contract eventually comes into the record and it says exactly what my opponents say, Judge Rakoff is still wrong on the dates. We have a breach of a duty. We have a disclosure of material nonpublic information. Then we have sales in the issuer's stock that have the telltale signs of the mortgage family fade and all the front running on March 24th and 25th, two days before the notice of default. I see I'm out of time. Thank you very much. All right. Thank you very much. Thank you both for your arguments. We'll take this case under advisement.